0804 to American Service Insurance Co. v. Parker, Jr. Counselors, please approach the podium. Counselors, tell us who you are and who you represent. Appellants, first. Jim Newman, for American Service Insurance Company. My sir. Steven Carroje, for National Casualty Company and Elite Rental. Michael Cannon, on behalf of the appellee, Jose Torres. George Acosta, also on behalf of Jose and Elise Torres. We, Mr. Acosta and I, to the extent that the issue of ICC jurisdiction arises today, Mr. Acosta will be addressing that portion of the argument. I'll be addressing everything else. Have you agreed on how you're going to divide up the time? We had talked, and we thought since there was a cross-appeal, it would make sense for the appellant to go first. For me, as the cross-appellant, to go second. These gentlemen could go third to address both of our arguments and then rebuttal from the two of us in the same order. As we did in the briefs. Okay. Thank you. From a time perspective, the time, we're not strict on time, but try to limit it ten minutes apiece. It'll take us more. And remember that we're looking at the issues we deem important. We expect that you'd argue what you deem important, and we won't hesitate to interrupt you. Okay? Thank you. Thank you. May it please the court. My name is Jim Newman. I'm the attorney for American Service Insurance Company. I'm sure the courts are well aware of the facts, but I will resuscitate what I believe are the most important relevant facts in this case, and those are also outcome-determinative facts, and they're not in dispute. First fact is that at the time of the accident, the automobile, the truck being driven, was engaged in interstate commerce. It was moving household goods from Crystal Lake, Illinois, to Crown Point, Indiana. That's important because that distinction between interstate and intrastate commerce controls what statute applies in this case. The other fact which is important, again, not in dispute, is the American Service Insurance Company policy. It insured two trucks, neither of which was the one involved in this accident. It also insured two drivers, Iris Ramos and Daniel Ramos, the owners of Ramos Movers, who was the named insured under the policy. It did not insure the driver that was involved in this accident. Those facts are not disputed. They're in the record. They're conceded by all the parties. Now, there may be argument whether or not they could become an insured under a policy, but as far as the policy itself is concerned, it names two insureds and it names two vehicles. So we got in mind, ASI, my client, did not insure the truck owned by Elite Rental. Instead, that was insured by National. National Casualty has admitted in the course of depositions that the driver, Jones, was an insured under their policy because he was driving the car with permission. He was a permitted operator, and therefore the omnibus provision of their policy provides coverage. In this complaint, American Service filed a two-count complaint. The first count dealt with whether or not, at the time of the accident, the Elite vehicle was a temporary substitute vehicle as defined by the policy. The second count of ASI's complaint dealt with who would provide primary coverage in the event there was, indeed, coverage under American Service insurance policy. It is ASI's position, and it has been since day one, that National Casualty is the primary insurer on this policy. As I said in the beginning, the one outcome-determinative fact here is that we were engaged in interstate commerce at the time. And Section 1201 of the Transportation Law, which I cite, very clearly states that the provisions of the Transportation Code only apply to intrastate commerce. It reads, and I'll just read the important part, and except as otherwise provided elsewhere in this chapter shall extend only to intrastate commerce. I've cited numerous case law that interpret that statute and interpret it in comparison with what the court relied upon, which is Section 4901. Section 4901 basically mandates insurance for all truckers, regardless of whether or not the truck is on the policy. And that is what Ramos Movers and Elite relied upon and what the trial court relied upon. That provision of the statute. But as we point out, and the case law points out, that provision does not apply when you're dealing with interstate commerce. And that's what we have here. Now, the argument has been made that Section 1101, which is the section that they rely upon, is more specific, but that's not the case. 1101, and let's talk about 1201 first with interstate commerce. Section 1201 deals with the actual transportation of goods, the movement of goods, and that's what we're dealing with here. The section that they rely upon deals with the business aspect. If you are domiciled in Illinois, that provision would apply to you. And the reason that is is very simple. Illinois cannot regulate interstate commerce. No state can regulate interstate commerce. And I guess there are some few exceptions to that. But if we were to take the rationale or the argument that Elite and National and Ramos Movers have made, every truck that travels through Illinois, if they're going from New Mexico to New York, would be subject to the insurance requirements of Illinois. And the case law that I've cited, and there's numerous cases, say that that just can't be the case. So it's been your position, it has been from day one, that even though your trucking firm is a domiciled itself in Illinois, even though the accident took place in Illinois, since the ultimate destination of the furniture in question was Crown Point, you're out the hook. Right? Where did the accident take place in Disco? The accident occurred in Illinois. But the issue is whether or not certain provisions in the administrative code apply. And under 1201 and under the case law that I cited, every case, in fact, every single case that dealt with this is on my side. There's not a single authority to suggest that just because the accident occurred in Illinois, that somehow we ignore the provisions of the code. It's still interstate commerce. Because interstate commerce is defined as a starting point and an end point. That's what makes it interstate commerce. As soon as he got in the truck and was heading to Indiana, it becomes interstate commerce. And you can't crunch the law or rewrite the law. The law has to be applied as written. And all of the case law that we cite, and I cited in the Disco case is a good case, that deals with that. And what the Disco case said was that it was a UPS truck that was being operated by a repair person. And because the UPS truck was bound to have insurance under 1201, they argued that it was mandatory insurance. But the appellate court came back and said no. While it applies generally to UPS, it doesn't apply to this particular situation because that's an exception to the ICC jurisdiction. Because it's a repair guy driving it. It was a repair guy driving the car, and it was outside because it wasn't being used at the time for trucking purposes. It was being repaired. It was an exception to the 1201. And likewise, 1201 is an exception as well because it's interstate commerce. And every case that I've cited stands for that same proposition. If you look at the public policy, this is one of the things that the court relied upon below. She said it was a matter of public policy that insurance coverage is mandated under 4901 and 1101. And unfortunately, with all due respect to Judge Mason, that's just wrong. Public policy, I guess I should say, cuts both ways here. What we're dealing with here is an American Service Insurance Company who did not insure the vehicle, who did not insure the driver. Okay? On the other side of the fence, you have Elite, which is a rental that rents trucks. Not only insures the vehicle, but also insures the driver. From a public policy standpoint, and I cited the case law, again, or the statutes in my reply brief, in every instance that I've been able to find, and this includes private passenger automobiles, which is taxi cabs, personal rental vehicles, commercial trucks, and commercial rental trucks, in every instance the Illinois legislature has mandated that the owner of the vehicle provide insurance. Nowhere in there is it required that the driver of a vehicle provides insurance. And if there's ever an instance of establishing public policy, that is it. The public policy is that the owner of the vehicle has to provide primary insurance coverage for the vehicle. And in a rental situation, that makes the best sense, as I point out in my brief. In this case, you have the Jones who rented this vehicle. They didn't even check to see whether he had insurance. And this is, again, who rented the vehicle? They can argue that Ramos Movers rented the vehicle, but the rental agreement, which is part of the record, it was rented by Jones, the driver, who Ramos Movers claims was an independent contractor. But Jones walks in off the street, rents a vehicle, and gets involved in an accident. Illinois law requires the trucking company, at least, to insure that vehicle and to insure everyone who operates it. And there's another key, because the statute requires them to insure the operator. And yet, Judge Mason found that public policy required ASI to provide primary insurance, when ASI neither insured the vehicle or the driver. And that's a basis for reversal right there. Ramos sent Jones to get the truck though, right? And he was doing it under the auspices that he was doing it for Ramos. Well, Judge, the record does appear to indicate that. But Ramos Movers, part of the problem is Ramos Movers has claimed that he was an independent contractor at all times. The contract that was entered into, and this is an important point too, because Jones is a stranger to our contract. Jones is not a named insured under our policy. Does your policy name any of the truck drivers of Ramos? Yes. It names two insureds, Iris Ramos and Daniel Ramos. Those are the two operators identified in the policy. Does that exclude all other operators then? No, it doesn't exclude all other operators, because another operator would have coverage under the Omnibus provision if they were operating one of our trucks. And that's what Illinois law requires. But that's why it doesn't apply here, because this was not our truck. Hanson, the way I look at it, and correct me if I'm wrong, Ramos knew this was going to be interstate. And Leet, did they know? I don't know that Leet, whether or not they knew it was going to be interstate. Well, I think if Leet knew it was going to be interstate, they probably shouldn't have rented the truck to them, if they knew. That I don't know. You'd have to ask them. That issue never really came out of discovery. Would it make any difference? I don't believe it would make any difference to my case. I think what makes a difference to my case is that they rented the vehicle to a driver, and they were required under the law to insure that driver. Now, one of the arguments that they make is saying, wait a minute, there's an exclusion in our policy, in our rental agreement, not in our policy, in our rental agreement, that says that you guys have to provide primary insurance. And the point I make is, if that is in fact the case, then Arthur Jones's insurer, the driver, would have primary insurance. Because Arthur Jones, as a stranger to our policy, could never, under any circumstances under the law, bind ASI to insurance coverage. Because he's not an insurer under our policy. So if the issue here is who would provide insurance because of their exclusion, it would be Arthur Jones, who rented the vehicle. But again, Elite didn't do anything to check insurance. And that is why the law requires for them not only to have insurance, but to insure everyone operating the motor vehicle. The law does not require for us to insure somebody that we don't insure, Jones, on a vehicle that we don't insure, which is this Elite vehicle. But Reynolds did send Jones to Elite. And when Jones rented the vehicle from Elite, he told them he was doing it for Reynolds. Is that correct? That I don't know. The rental agreement is part of the record. The rental agreement lists the renter as Jones. And we've taken the deposition. And I guess I'd say that's a question of fact, if anything else. If you look at the application itself, on its face, it says renter Jones. He rented it. But I guess I would concede to the extent, you know, he was renting it for Reynolds because Reynolds Movers is the one who had the contract that ultimately moved the goods. But that's exactly the point on why the Illinois legislature requires the person renting the vehicle to insure the vehicle for this exact situation. Can you help me out on this issue? The MCS-90 endorsement that I guess that the Secretary of Transportation has trucks have when they go interstate. Yes. With ASI in reference to this case, were they required to have this insurance? No, for two reasons. One, when he applied for it, when Reynolds – MCS-90 is only required for interstate transportation. And in this case, Reynolds advised ASI that he was only operating within Illinois. And also the same thing as we took the deposition of the – I think his name was Lazarus, the Interstate Commerce Commission employee. Reynolds – or excuse me, Jones – pardon me, Reynolds, the insurer, never applied for any interstate stickers or MCS-90 endorsement. He didn't have the application. So he was not permitted to move things interstate. Was it argued down below? The MCS-90? Yes. It was argued down below, but the court never got to that point because of – the court never got to any of the factual issues in this case. Because frankly, if this court affirms on – which is basically saying that 1201 doesn't apply, as far as coverage is concerned, those facts don't matter. And that's why the court never got to it, because the court said that insurance is mandated under our policy, regardless of whether or not he had permission or whether or not the vehicle was insured under the policy. But in this case, there is no MCS-90 endorsement because he was not permitted to move out of state. And that's a very important point to make here, because in the records – this goes, again, to the factual issue, but why was this truck rented in the first place? Jones gave a statement to American Service Insurance Company, which is in the record, saying that the reason they rented the vehicle is because they were moving out of state. They didn't rent the vehicle because they couldn't have a Ramos vehicle with Illinois plates unless they had an MCS-90 endorsement and a placard. There's also evidence that one of the cars – one of the two trucks was not operating, right? It was in the shaft. There was evidence that one of the trucks – that's right, but we hired an expert that went out and looked at the truck. And, again, that's a question of fact. That's part one. That's count one of the complaint. The trial court made no findings and didn't even address whether or not this was a temporary substitute vehicle. And it's not before this court. I know they wanted to try to bring it up in front of the court, but that's a question of fact for the trial of fact in the court below. The court never had to reach that point because it was irrelevant if 1201 doesn't apply. And that's why the court never got to the point of whether this was a temporary substitute vehicle or not. We did not file a motion for summary judgment on count one for that reason because they had an argument to make that it was out of service, and we had an argument to make that it was in service. It becomes a question of fact. It would be a waste of time to argue that issue. But from a public policy standpoint, one of the things that the court below said was that Illinois doesn't – the courts don't lose jurisdiction. And I think, Justice Quinn, you maybe touched upon this. If this accident occurred in Illinois, the court doesn't lose jurisdiction. And that's – I've never contended otherwise. Who loses jurisdiction is not the court. This is a matter of jurisdiction for the Illinois Commerce Commission and whether the statute applies. The court would obviously always have jurisdiction over this issue. But the Illinois Commerce Commission does not because it's interstate commerce. So while you can – while the Illinois courts can litigate the issue of coverage, they can litigate the issue of liability. They can do all of those things. What they can't do, Illinois can't regulate interstate commerce. That's where Judge Mason made her mistake. Would the ICC have been applicable had Grand Los not erected the car, rather, one of their two fine running trucks that was used to go to Crown Point? They would be an insured – they would be an insured if they were using their own truck? Yes, unless there was another exclusion, there would be coverage to our policies. But that brings to the second argument, which is who's primary and who's secondary. Our policy on its way very clearly says that if it's a temporary substitute vehicle, which is the only way that this car could become an insured if the other vehicles were out of commission, that we are secondary coverage. And the Leeds policy very clearly on its face says we are primary coverage for any time an insured is operating a motor vehicle and Jones isn't insured under their policy. So that's a – we go back to what the general rule is in Illinois. The owner's policy is primary. Judge Mason even found that there was coverage under a Leeds policy. So you have a finding of American Service having coverage, which we disagree with because we don't believe that there's coverage, but you have the fact that there's coverage under a Leeds policy, which they admit in their brief, they've admitted below that there's coverage. So who's primary and who's secondary? Again, we go back to the statutory construction. They own – a Leeds owned the vehicle, they rented the vehicle, the law requires them to provide coverage, it doesn't require us to provide coverage, and their policy says that they're primary. Our policy says that we're secondary. I don't know how we could become primary under these circumstances. All of the other issue, which I point out with the code, section 59105 requires that the driver be insured, and that's for trucking, for the truck. So a Leed was required by statute to insure the driver. That's the public policy and that determines who's primary because there's no statute that requires us to insure the driver. The statute that they're relying upon, that Judge Mason relied upon, required us to insure the truck, and it doesn't apply because of interstate commerce. The one case where I will point to the court, which I think is directly on point, is Kern versus Michigan Mutual. It's, I believe, cited in my brief on page 21. Kern, and I'll read a quote from Kern. They're citing a California case, and it says, the California court found that no public policy was violated if the owner's policy was held to be primary. And this was a trucking case. Kern also affirmed that an insurer of a trucking company such as Ramos can provide in its policy that its liability deemed excess coverage for certain classes, and that's what Judge Mason said. We couldn't have an excess clause in our policy because it violates public policy, but the federal court says you can because the public policy here is just to make sure that they're insured. Now, you've got to keep in mind, the excess clause in any policy isn't triggered until there's a primary, so it doesn't deny coverage, and that's why it doesn't violate public policy under any circumstance. It shouldn't violate public policy unless public policy mandates and requires that you provide primary insurance, as it does for LEAP. The final, the other issue here that's raised by LEAP, and they cite cases saying, hey, we're a rental vehicle, and they cite all these cases saying that we can exclude ourselves from coverage. Every single one of those cases dealing with rental agreements, which has an exculpatory clause in it saying you've got to get your own insurance, every one of them has, from a factual standpoint, is distinguishable because in every instance it was an option for the person when they went in there and rented the vehicle to say I'll have my own insurance coverage or I'll have your insurance coverage and cover it, and so you can opt out of it. That's not the case here. The deposition testimony and the agreement itself, there was no option for Ramos, Movers, or Jones, whoever's renting the vehicle, to have insurance apply, have LEAP's insurance apply. Instead it just said your insurance is primary, and that you cannot do. That violates public policy. In the case file that they cite, as I point out, every one of them has to do with having the option, and the court actually made that distinction itself in the State Farm case, and I'll read you the very simple quote here. As here, the car rental agent offered him a choice between relying on his insurance company to provide primary coverage or paying a higher cost in order to be provided full coverage through the rental agencies. The court emphasized that there were two separate agreements the driver could have entered into. We don't have that here. We have a contract that only allowed for the Ramos, Movers, or Jones to rent the vehicle and not get coverage, and that violates Illinois law because they're required to provide that coverage. The final issue which I touch upon is the advisory opinion nature of Judge Mason's ruling as it relates to the amount of coverage for LEAP. Judge Mason found that there was a million dollars coverage under nationals policy, and that's an advisory opinion, and the case was very clear on it that it cannot stand. If you look at it, let's assume that he were to rule it was $50,000 instead of the million dollars, then you're on the hook. Let's buy your argument that ASI is a seconder. You're an excess carrier. Okay, you're an excess carrier. If we agree with their position that they only are on the hook for $50,000, well, you're on the hook then so far as of March of 2006 for $785,000 worth of damage. Since this man's been damaged as of March of 2006, I understand he hasn't gone to trial yet, over $835,000. So isn't that the first thing you should do is decide whether they're on the hook for a million or $50,000. If they're on the hook for $50,000, well, you can accept your idea that you're excess, and then you're on the hook for at least $780,000 as of four years ago, right? Well, you asked me, let me see if I can address all your questions. It's an advisory opinion because in order for the opinion to attach, it is a but-for, or if. If a judgment's entered, then there would be a million dollars worth of coverage. That's what the courts have said in every case that that's an advisory opinion, and the courts can't do it. The case that Judge Mason relied upon saying, oh, it's not an advisory opinion, we can make this determination, is very easily distinguishable because the case had settled. There was a finite dollar amount. There was a settlement, or there was a judgment amount. We know that there's a judgment amount. We know there's a dollar amount. Anything short of that, anything that the court says with respect to what could happen in the future, in the event there's a judgment, is an advisory opinion. The case is kind of this in-relied mountain of Boeing versus Lloyds, which I wrote, which was a state case. It had nothing to do with really the issue in that case. It was a discovery issue, should it have been addressed prior to the arbitration in Paris. And I thought, well, you know, how much money is going to be owed is going to be determined in Paris, not in the courts of Illinois in any event. So the judge is not to guess how much the coverage will be. That's covered by an arbitration. So I suggested relying on Boeing versus Lloyds. That's completely an opposite to what we have here. Judge, I disagree. I cited three or four cases here, and I think the case law says that an opinion that if the appellate – Well, you should not have ruled on whether or not they're on the hook just for $50,000. You should have said, I'm not going to rule on whether you're on the hook for $50,000, even though they're in front of them as well, right? Judge, if you want to – let's look at the order, and this is part of the reason this is up on appeal too, which is, you know, is this a three or four-A case or whatever it may be. When ASI filed this complaint and it went to summary judgment, the judge originally thought the case was going to be over, but then Elite came in and said, wait a second. There's still the issue of whether or not there's indemnification. And so the judge said, well, maybe it's an indemnification issue. Therefore, it's going to be a three or four-A case. Now, I disagree with that. I disagree with that, that this is a three or four-A case. I think that when the judge found that there's a duty to defend, that ends the case, because for my complaint, my claim that there was no duty to indemnify was predicated entirely upon there's no duty to defend. And this goes to your point. If the judge is going to hold off and keep the indemnification aspect of my case and hold onto it as she did because there has not been any judgment entered, then how in the world can she say what the exposure is there? It's the same thing. It is the same thing. What applies to ASI would also apply equally to Elite. Until there's a judgment entered, because let's just play. I know they're going to argue, oh, wait a minute, we're going to get a judgment. Let's just assume in this case that they go to trial and they lose. The jury comes back and says no money. Is that not the very definition of an advisory opinion that Judge Mason gave? Well, because it never comes to fruition. There's nothing there. And that's why you have to have a dollar on a side. Every other coverage case where the question is how much coverage is there, and they go ahead and they win. Insurers actually win a lot in Cook County. So how is that different? In this case, the third party and the insurer. And the insurer is all desirous of knowing what money everybody can be on the hook for, if there's any liability at all. I have not found a single case that, in front of the appellate court, and I've not tried a case in front of Chancery where the court has, other than this case, where the court has made such a finding. I'm not aware of any appellate court opinion that says that the trial court can make a decision on what the amounts of coverage are. The potential for coverage I would think comes up all the time. The potential for coverage is different than what the dollar amount is. The potential is how much the coverage is. Does National stand to lose $1 million or $50,000? That's the dispute, is it not? Yes. Okay. It is. And if the trial court is asked, is National, do they stand to lose $50,000 or $1 million or anywhere from zero to a million, because they could be found not liable. Judge, the Batiste case, is that the case you said that you wrote? No. The Batiste case, which I cite, this is the rationale behind it. It's a sentence that reads as a quote. It says, moreover, and this is where they did not allow this. This is not an indemnification case, counsel. This is not about indemnification. But in the Batiste case, that was the issue, whether or not they could make a determination on the amount of coverage. And the appellate court says, moreover, if we were to allow this action, there's no reason why every court claimant would not, upon filing a personal injury action, file a declaratory judgment action to determine the maximum amount of coverage to which it would be entitled to in the event the liability was subsequently established. We cannot create that right to such premature litigation. And that's filed by the third party. Does National wish to know what they're on the hook for? Are they not participants here? They are participants here. Don't they wish to know if it's $50,000 or a million? Judge, while I agree with you there, but it still stems back from what the role of the circuit court is. It's an advisory opinion. Because here's what they're asking. They're saying, in the event that a judgment is entered against me, can you tell me how much I have to pay? I don't think that was the question, counsel. Okay. Well, I think the case that I cited on this, I believe, is on point. I'm merely making the argument. I'll be done here. The other two issues in here that are raised in the briefer, whether or not the trial court erred in denying my motion to file an amended complaint. We asked to file an amended complaint after the court entered judgment for the purposes of finding co-primary insurance. So in the event that this court reverses. Wasn't that part of the trial court's order in the 304A language? It was not. I cited a case in my brief that allows the appellate court to rule on this. In the event that the court reverses. Obviously, if the court doesn't reverse, it's moot. But in the event that the court reverses, the issue then becomes potentially whether or not they're co-primary. And we're co-primary or they're primary. And for that purpose, I would ask to amend my complaint. I had to file this in order to preserve it for appeal. And the other issue was a discovery issue which arose, which again, in the event the court reverses this, this is a significant discovery issue. Judge Mason did not allow American Service Insurance Company to get the tax records from the IRS from Ramos Movers. Ramos Movers had admitted under oath in discovery that they filed tax returns. And when we asked for them, they did not produce them. We wanted on a motion to compel. The judge told them to produce them. Then they changed their answer to we didn't file them. I then requested that they sign the appropriate document for the IRS for me to get them from the IRS. I attached an affidavit from an expert, my accountant, uncontroverted, that that would be standard accounting procedures. And the judge refused to allow me to get these documents. Why are they important? In the event that this is reversed and there was ever going to be a trial as to whether this was a temporary substitute vehicle, these documents are critical in determining whether or not they rented these vehicles for purposes of adding extra vehicles or for purposes of when the vehicle broke down. Why would the returns show that? Because the returns will show how much money that they made. We hired a forensic accountant. He gave an affidavit that basically, in a nutshell, what he'd be doing is looking at their receipts, their bills, and comparing it to the amount of money that they brought in. The receipts show that, but not the returns. No, the schedules on the returns. Judge, I don't pretend to be an accountant. All I attached was an affidavit from my forensic accountant saying that in order for him to give an opinion, in order for him to set up and give an opinion, he'd have to have those records. Now, if they don't exist, well, that's an issue by itself because we have a badge of fraud there for doing that. But if they do exist, we're entitled to them because in order to check them with their actual books to determine whether or not they rented multiple vehicles. So, for that reason, I'll stop here and save my time for rebuttal. I would ask that the appellate court reverse the trial court below for the reasons stated in my brief and the reasons here in oral argument. Thank you. Thank you, Counselor. No questions? No questions? Counsel? Thank you. And please, the court. Again, Steve Cologe for National Casualty Company and Elite Rental, the appellee slash cross-appellants. A follow-up real quick on the last points that Counsel was just arguing. This is a 304A appeal, and the order on the denying leave to file the amended complaint did not contain Rule 304A language. It was not ever part of the order that did contain Rule 304A language. They're separate orders. I don't believe that issue is properly before this court. The same goes with the discovery order that Counsel is arguing about. That order contained no 304A language. I don't think legitimately that was a step in the procedural progression leading to the partial summary judgment on the issue of duty to defend such that it could be properly reviewed under the notice of appeal that's currently before you. So I don't think either of those issues are in play here. Now, I would suggest to the court that you can decide this case without ever addressing the interstate commerce, interstate commerce issue, or the applicability of the transportation law or the MCS 90 endorsement, any of that, for the reason that procedurally what is before you is an undisputed coverage under ASI's policy. And the reason for that is that, as Counsel mentioned, ASI's declaratory judgment complaint contained two counts. The first count alleged that there was no coverage because this is not a covered vehicle. The second count alleged that this is a temporary substitute vehicle under the policy, and therefore we owe only excess coverage. There's no dispute that the policy covers temporary substitute vehicles. ASI moved for summary judgment solely on count two, thereby conceding, as they expressly stated in their motion, that this is a temporary substitute vehicle. The defendants then moved for, they filed cross motions for summary judgment on both counts of ASI's complaint, and the court entered summary judgment on both counts. In front of this court, ASI does not argue anywhere in its brief that this is not a temporary substitute vehicle. And they again reiterate to the court that they ask the trial court to assume that fact. And I've cited the steadfast insurance case, which states, when the parties file cross motions for summary judgment, they concede that there is no genuine issue of material fact, and there are only issues of law for the court to address. In this case, what was conceded was that this is a temporary substitute vehicle, and the only issue for the trial court to address was whether there is excess or primary coverage under ASI's policy and national casualties policy. So before this court, I think it is undisputed and cannot be disputed that this truck was a temporary substitute vehicle within the meaning of ASI's policy and is therefore covered. And the only issue, therefore, before you is whether there is primary coverage or excess coverage. That issue turns, as it did in the State Farm v. Hertz and Farm Bureau v. Alamo, it turns on the enforcement of a contract between the two insureds under each policy. Farm Bureau and State Farm both hold that an insured may contractually agree to look to its own insurance first before looking to the insurance of the rental company, and that this does not violate Illinois public policy. I've cited the Supreme Court's case of... But in those cases, counsel, there's waivers on that, and that's what those two cases stand for, the proposition that if I go rent a car, the person at Hertz or whoever it will be will say, Mr. Quinn, do you want collision damage waiver or do you want it to be primary or excess? If you want me to be primary, then you'll have to give me $40 additional a day. If I say, well, no, I'm renting this based on my MasterCard. I think I'm covered. I can't read the stuff, but it says I'm covered. Thank you very much. And I've initialed five different places. I'm waiving all that. There's no evidence in this record that the fellow who rented this thing on behalf of Reynolds, Mr. Jones, waived anything. And actually, Your Honor, that fact mitigates in my favor because in this case there was no opt-out provision. There was no provision that you choose one or the other. What this rental agreement says is our elite's policy covers you. It just applies after your own policy is exhausted. It was automatic coverage given. It was just given as excess. It wasn't a question of you pay to have additional coverage through us or you take your own. It was you get ours, you just get it excess to your own. There is no difference in that fact pattern that mitigates in favor of finding that this case is distinguishable. It's a distinction without a difference. While we're on that note, I would just point out to the Court in response to what counsel said, that the rental agreement, which is part of the record, the Court was addressing earlier the status of Ramos with respect to Jones. And the rental agreement lists Arthur Jones as the driver and Ramos Movers as the company. Furthermore, in ASI's motion for summary judgment, they stated as an undisputed fact that on October 5, 2004, Arthur Jones was employed by Ramos Movers. So that is also an undisputed fact before the Court. Getting back to my point about Farm Bureau and State Farm, the Supreme Court's decision in John Burns. Yes. Isn't there a general rule that the car's owner or the truck's owner would be the primary insurance? And then there's exceptions to that? There is a general rule, but Farm Bureau and State Farm hold that, although that's the general rule, where there's a contractual agreement between the parties to shift to a different policy, that must be enforced. And that's exactly what we have here. That may be the general rule. Is that on your policy or anything? I mean, the government assigned this, and it may be two or three or four pages, but does the print highlight this? Well, it's a term and condition of the contract, but it is a contract between two sophisticated businesses. This is not a driver up the street going to Alamo or Hertz to rent a car. That's one difference. And secondly, I don't see that whether it's highlighted or not makes a difference under the holdings in these cases. Farm Bureau and State Farm don't mention those as factors in the analysis.  But it is subject to the exception that that can be contractually modified by the insurers, which is what was done here. Moreover, as I stated, there is no question that ASI's policy provided coverage. This is a temporary substitute vehicle, and that issue has been waived as to whether it was not. And so given that fact, that policy is in play. It's really just a question of which one is excess or not. It's not a question of whether there's coverage or not. There is coverage. It's just whether it's excess or primary. This contract says it's primary. And under Farm Bureau and State Farm, that is perfectly legitimate. It doesn't violate public policy. And in fact, in the Pekin Insurance versus Fidelity case, where the owner of a vehicle that had mandated required insurance, the court held that it violated public policy underlying the mandatory insurance laws for the insured to attempt to deselect their own coverage and choose a different vehicle's coverage. But that's not what happened here. Here, the insured opted to have their own policy apply first and to have ELITE's policy apply second. I'll go into Pekin, though, reading from it. Here, both the Pekin policy and the Fidelity policy contain other insurance clauses purporting to make their coverage excess in situations where the named insured does not own the vehicle being used. Where two insurance policies each purport to offer only secondary coverage, the insurance of the vehicle's owner is primary while that of the driver is secondary. And I believe their point was that you are asserting that national policy is clearly excess because it says so. It says that it has to be excess. Their argument is, well, the only theory under which KSI could be held liable is under the substitute vehicle, and under the substitute vehicle insurance, that clause is also secondary. And so then we revert back then to Pekin's instruction, which says, by the way, when both insurers, which happens about 90% of the time, as I can tell, claim to be excess, then we're going to have to own the vehicle on the hook as being the owner and their primary. Why wouldn't we obey that rule here? Two reasons. First, the court has acknowledged in Farm Bureau that the general rule is subject to modification in the rental vehicle context, which is what we have here. Secondly, the Supreme Court's decision in John Burns' construction versus Indiana insurance teaches that an other insurance clause does not automatically reach into another policy out there if the insured doesn't choose to look to that policy. And I suggest that here, where the insured contractually agreed to look to their own policy first, the other insurance provision in that policy does not allow the insurer to trump its insurer's wishes to look to its own policy first. And that's why ASI's policy... Well, I would think the insured, such as they are rentals, would look to a national before they look at ASI. Do they not? Well, they contractually agreed otherwise. Although we don't have a Burns' argument here, do we? Did I miss something? I had a Burns' argument in my brief. I think that the contract speaks for itself. It says that this insurance, we will provide coverage, but all coverages afforded under this agreement are applicable only after all other valid and collectible insurance, whether primary, excess, or contingent, has been paid and exhausted to the full limits of all such policies. That's the contract Rameau signed. That's the agreement they made. So they agreed to look to their own coverage first. I'd like to turn to my cross-appeal at this point, unless the Court has any further questions on that issue. With respect to the prematurity advisory opinion issue, I think the Scottsdale insurance case is on point with that, and as Justice Quinn, as you pointed out, this kind of issue gets raised all the time in declaratory judgment actions. It's not an advisory opinion, and the reason it's not, and the distinction between this case and Batiste, for example, is in Batiste, the court held, there was no actual controversy between the parties that could be the subject of a declaratory judgment action because there was no dispute as to coverage. Here, there's a dispute as to coverage. We have two insurers, one of them, the named insurer's own insurer, arguing we don't have coverage, number one, and number two, if we do, we're excess. We have the national casualty policy arguing that they're excess instead of primary. There is a dispute versus coverage, and there is, in addition to that, a dispute between national casualty and Torres, the underlying plaintiff, as to the amount that, as you put it, that national casualty will be on the hook for. And that is properly before the court as part of this declaratory action. There is an actual controversy. Moreover, this does not involve a declaration as to any duty to indemnify. That issue has been stayed by the trial court as it must be until the underlying case is resolved. It's not a question of what amount national casualty has to pay now. It's not a question of whether they have a duty to indemnify. It's merely a question of contract instruction because the trial court held there was an ambiguity and construed the policy to require this amount of coverage limits. We contend there is no ambiguity. That's an issue of policy construction. It does not concern duty to indemnify or underlying facts governing the liability in the underlying case. And therefore, this is not a premature issue. It would not be an advisory opinion, and you can't properly determine that issue. Given that fact, turn to the endorsements in the national casualty policy. Now, the argument that Mr. Torres makes and that Judge Mason accepted is that there is an ambiguity, irreconcilable ambiguity, between the daily auto rental endorsement and the policy. Now, Judge Mason stated it to be an ambiguity because there was a conflict between the daily auto rental endorsement and the covered auto symbol endorsement. Now, those are both endorsements to the policy. They're not part of the main body of the policy. And the covered auto symbol endorsement has no provision whatsoever related to limits of liability. It merely expands the covered classes of automobiles provided in the schedule in the main policy. Nothing about that endorsement conflicts with the daily auto rental endorsement. The conflict is between the daily auto rental endorsement and the main body of the policy, the declarations page, which lists the coverage limit for all covered vehicles, which is a class 10, which includes all vehicles owned by elite, whether rented to customers or used by elite in its business, $1 million. The GE Mathis case, the other cases I've cited, state that because a policy initially sets up the broadest possible coverage and then through endorsements narrows that coverage as to certain risks, does not render the policy ambiguous. That is exactly what happened here. It's what happens routinely with insurance policies. Form policies are used for the body that contain coverage limits for every possible risk for the insured. And then a series of endorsements narrow that coverage or even eliminate it altogether as to certain specified risks. In this case, the daily auto rental endorsement limited coverage, the scope of coverage for one particular class of additional insureds, renters of vehicles, to $50,000. And moreover... But that's a great bulk, is it not, of this particular elite? I'm sorry, I missed the first part of your question. Isn't the great bulk of their clientele elite the renters, the ones who rent for a day or two? So the great bulk of the people who rent then will be given a document from elite saying, National Bank, insurance will cover you up to a million dollars, and they will then eventually determine, well, as you go through the pieces of paper, it's really $50,000 for the vast majority of our customers. Absolutely not, Your Honor, because the rental agreement here specifically states, Rentor, elite, provides liability coverage for persons using the vehicle with the permission of the renter in accordance with the provisions of an automobile liability policy with limits equal to the minimum requirements of any applicable state financial responsibility law. The contract right there says the coverage is limited to the minimum under the financial responsibility law. That minimum is $50,000. $50,000. So right there in the contract, they're told, you get coverage up to the minimum of the financial responsibility law. There's no confusion on the part of the renter of the vehicle. Wasn't that part of the clause that had the number 10 and then see number 10 and 10 referred to $1 million coverage? 10 is, again, the symbol endorsement. The symbol endorsement expands the schedule in the main policy that lists the classes of covered vehicles. The main policy has 1 through 9. The symbol endorsement has 10, and it broadens it. It absolutely does, and it does encompass rented vehicles. But you can't stop this, because then there is, and that endorsement has no limits of liability, as I said. Then you've got the daily auto rental endorsement that says, for any vehicle rented to a customer under a written agreement for less than a year, the limit of liability is $50,000. The construction being urged here by Torres would nullify that endorsement, and the case law says you can't do that. You have to read them together. Well, in looking at this area, though, form contracts in terms of auto insurance, I suggest, and not raised by the party, but it's different. So where do we see a bunch of cases in this area? I see a lot of cases in this area on under-insured and uninsured motorist riders, where our courts have found them to be ambiguous, since it always says no stacking will ever, ever be permitted, usually 10 times. And if the courts of this state have routinely found them to be ambiguous, based on an only Supreme Court case on stacking, they say, well, if you look at the two columns and compare the two columns, we can see where a renter, a normal human being, supposed to be a lawyer, would get confused, and that's our standard. What would a normal person do? And so not what would a judge do, or I do, or you would do, but what, in this case, would Mr. Jones do in looking at this? Would he know from saying, look at number 10, look at 10, this is a million, would he know he's not getting a million? Not that he cares, and not that Reno cares, because they don't care until somebody gets horribly hurt. And that's just the way that insurance works. Nothing against either of those people. Why wouldn't we look at that for the uninsured, underinsured idea of ambiguity? It would appear to be ambiguous under those standards. Well, I think the reason you don't look to that, Your Honor, is that, first of all, that's a stacking issue that you're raising. This is not a stacking issue. This is a limitation of liability issue, and it's merely just narrowing the coverage limits. Secondly, underinsured and uninsured motorist provisions, I submit, there's a specific statute addressing how those work and what's required to be in policies, and that statute isn't in play here. In fact, there is no statute in play with respect to this. We're really dealing with case law construing endorsements. We're dealing with your typical situation where an insurance company wants to limit or exclude coverage under endorsements for particular risks. That's what happened here. That doesn't render the policy ambiguous. If it did, every time there was an endorsement attached to a policy that conflicted with the main body of it, you'd have to find an ambiguity and basically nullify that endorsement, and that's essentially what the trial judge did here. $1 million applies to every vehicle initially at the outset that's owned by an elite. Endorsement then narrows that $1 million to $50,000 for one particular class. That is not ambiguous. That is an acceptable method of narrowing coverage with endorsements, and the endorsements have to control under G.E. Mathis and the other cases I've cited. So, again, the insured contractually agreed minimum financial responsibility is the amount of coverage I'm getting. The insured agreed that coverage is excess over my own policy, and for those reasons this court should affirm the trial court, and I think that, as I said, you can do so without reaching any of these issues with interstate commerce or jurisdiction. Thank you, counsel. Thank you. May I please support Michael Cannon and George Acosta on behalf of the Adelaide, Jose Torres. I forget how you're going to divide them. Mr. Acosta is addressing solely the issue of ICC jurisdiction over this company by virtue of the certification of the policy with the ICC. Who's going first? I think it would make more logical sense for me to proceed first. Yes. Okay. I don't want to confuse us. Why don't you just sit down. Thank you. May I please the court George Acosta again for defendants Jose Torres and Alicia Torres. I would like to address the issue of the Illinois Commerce Commission jurisdiction and the mandatory nature of coverage under 4901 and 4903. May I suggest to the court that this is really a simple case of financial responsibility. In 1993, under federal regulations, a single state registration system was put in place which required motor carriers, commercial transporters, in their home state of domicile to register, be it interstate or intrastate operations in their home state of domicile. This was brought to you through the deposition testimony of Mr. Lazaridis, who is an Illinois State Commerce Commission officer. Because of that system, Illinois now serves the dual purpose of registering both intrastate carriers as well as interstate carriers. And it's also obvious that some carriers will operate typically intrastate with some interstate ventures. What ASI is asking this court and what they asked in the trial court to find is that there's a giant loophole for regulation under the financial responsibility laws of the USDOT and the Illinois Commerce Commission. The loophole that they're trying to establish is that if you have an intrastate carrier, motor carrier, that occasionally will go interstate, that that carrier is not covered by the financial responsibility laws of the state of Illinois or by the federal mandated MCS 90 endorsement that is required of all interstate carriers. Ramos Movers was granted authority, and it's only operation authority that it has. It does not have interstate authority. It has intrastate and interstate exempt, and I'll get to that term in a moment, authority under its ILCC grant, a certificate of public convenience. This is all on the record. But what it was granted was operations within a 50-mile radius of the city limits of the city of Chicago. Now, clearly, a 50-mile radius from the city of Chicago could take you into Wisconsin, could take you into Indiana. Both of those are interstate designations. The federal system of regulation with financial responsibility laws recognizes that certain carriers that operate typically in larger municipalities, like Chicago, may venture across state lines while staying within a commercial zone, and this is specifically defined under 49 CFR 372.233. It defines the Chicago commercial zone as being a 20-mile radius from any point in the city of Chicago. You'll see at one point in our brief that there was in the trial court an affidavit from a surveyor which simply pointed out that the northeastern point of Crown Point, Indiana, and the southwestern point of Crown Point, Indiana, and the southeastern point of Chicago, which is Hedwig, are approximately 15.5 to 16 miles away. The only point of that is to say that under federal guidelines for financial responsibility, this motor carrier was authorized to go to points within that commercial zone without triggering federal regulation. Without triggering federal regulation. Now, let me go back to the Illinois Commerce Commission for a moment because ASI, throughout the pendency of this case, both in the trial court and here today, has misstated a vital point. We are not suggesting that the jurisdiction of the ILCC comes under 1101 or 1201. Council referred to 1101 a number of times. 1101 has to do with the public policy. It's 4101. Let me be very clear. It's 18C4101, which expands the jurisdictional scope of the work that the ILCC is doing under its function of financial responsibility. Now, the ILCC has multiple functions. It may set rates and tariffs for the transport of produce, et cetera. And in that context, it is limited under 1201 to strictly intrastate regulation. It can't regulate intrastate commerce, which is exclusive to the federal government. However, when it comes to financial responsibility laws, in subchapter 4 of the Transportation Act is where we find the financial responsibility laws. That has a broader jurisdictional scope. 4101 specifically states the jurisdiction of the commission shall extend to all motor carriers of property operating within the state of Illinois. So we're not talking about regulating the size of the truck or the weights or the tariffs that companies might be using in intrastate commerce. We're talking about public safety, financial responsibility laws for public safety. And between the federal regulatory scheme for financial responsibility and the state, which covers all motor carriers now, if you look at it from that standpoint, the federal and the state regulations, all motor carriers are subject to these financial responsibility laws. There is no loophole as ASI is attempting to exploit in this case. So it is 18C4101, not 18C1201, which is the general. And by the way, counsel for ASI also mentions and cites here the language in 1201. And if you read it, it says that except as otherwise provided elsewhere in this chapter. So they foresaw in writing 1201 that there might be additional grants of jurisdiction later in the same law. And indeed 4101 expands that law. With regard to the case law, as the court pointed out in the Biscoe case, it was not a question of whether the financial responsibility law was triggered because of intrastate travel. It was a question of the type of use that the vehicle was being put into. It was not the operations of the motor carrier that were at issue in Biscoe. It was incidental travel, and that was the focus of that decision. It was incidental travel because an auto body shop driver was transporting the UPS truck from, I think, a facility to its repair facility. So it was incidental travel. It was not part of the grant of operation that UPS had, which would have arguably then triggered the financial responsibility laws. We would just suggest to the court again that 4101 is controlling instead of 1201. And if you don't have any other questions, or if you do... No questions, counsel. Thank you. Thank you. So then under 4101, as you argued then, ASI would be liable, is that correct, as a primary? Yes, and thank you for raising that question. Part of the argument that Mr. Colosio had kind of skipped over that because it does have to do with primacy. Under the financial responsibility laws, it makes ASI's certified policy for public safety purposes primary. I think my co-counsel will be addressing that. Does that answer? I'm sorry. Oh, it does. Thank you. May it please the court, Michael Tannen on behalf of Jose Torres. We included a very lengthy statement, a fact section in our brief, to highlight that from the very first instant that ASI learned that this accident occurred, they had been trying to skirt the significance that ASI itself had twice certified this policy with the ICC. This ICC certification was not canceled until after the accident. On page 21 of our brief, we highlight the fact that despite the certification of the policy with the ICC, ASI nonetheless trolled for serial reasons to deny coverage. They didn't get notice. They didn't schedule the elite truck, the alleged revocation of the cap cards. In during suit, ASI claimed that Ramos had failed to cooperate because they did not sit for examinations under oath, although the policy did not require them. And I'll get to the reimbursement provision in a moment. The certification of the ASA policy is a bear trap. ASI cannot escape its grip. The certification of this policy is required for the safety of the public, and the policy carries with it an implied term of coverage, which is in section 4903, that any vehicles operated under the authority of Ramos will be covered, even though the vehicle was not expressly scheduled. For three years now, Founders Insurance versus American Country Insurance Company has been on the books, and we have cited it repeatedly, and ASI refuses to grapple with it. In that case, the Illinois Appellate Court compared the taxicab insurance provisions of the Illinois Vehicle Code with section 4903, and said that section 4903 is the type of public safety insurance statute that the legislature enacted to cover all vehicles, regardless of whether they're scheduled or not. In the Founders Insurance case, there was no statute that required American Country, the taxicab insurer, to schedule or cover all vehicles, whether or not they're scheduled. ASI's failure to grapple with Founders versus American Country, to us, is very troubling. More importantly, ASI has ignored every single case that we cited that says that when an insurance policy is issued pursuant to a public safety financial responsibility statute, the insurer cannot use coverage defenses as to its insured to deny members of the public, who are statutory beneficiaries of the statute, coverage under this policy. We cited Johnson versus R&D Enterprises, Great American versus Brad Movers, and Illinois Casualty versus Kroll for that proposition. Johnson is a significant case, and I'll talk about reimbursement in a moment. We were talking a moment ago about the Pekin Insurance case, and the reason why the owner of that vehicle was required to provide primary coverage, I don't think it had anything necessarily to do with who actually owned the vehicle, except that it was a tow truck, which was required, like Ramos Movers, to have public safety insurance, and it was against public policy for the owner of the tow truck to deactivate coverage when there was a public statute that said otherwise. And so that is a similarity between the tow truck insurance case and our case here. Based on our review of the case law, your Justices, there has not been a reported decision that emphasizes the importance of reimbursement provisions since the Johnson case in 1982. Johnson involved a predecessor to 4903, where the insurance company was held and could not use late notice or, like here, a breach of the duty to cooperate, to deprive an injured member of the public coverage under a public safety statute. The court went on to say that the insurer was not without a remedy. It could pay the injured tow truck claimant and then seek reimbursement from its own insurer. This implied term of coverage nullifies all of ASI's efforts to invoke the temporary substitute vehicle provisions, and more importantly, when ASI issued this policy, it assumed a risk it would not otherwise have been obligated to but for the commercial transportation law. It could have, but it chose not to, buttress its reimbursement rights by requiring Ramos, a mom-pop corporation, to post a bond, pledge collateral, or tender a letter of credit so just in case, like here, there was an accident involving a vehicle that was not scheduled, ASI is on the hook for it and they can seek reimbursement from its own insured. Jose Torres has been waging this battle from day one. Ramos Movers is no longer in business and is a tort claimant. Jose Torres has been making all of these arguments. This ASI waged war against Ramos Movers from day one. They went on this witch hunt for documents to establish what its financial condition was. I would argue that ASI was obligated to do that before it issued the policy to get some protection from its own insured in the event that ASI was on the hook by virtue of the Section 4903. We cited cases, a gaggle or a legion of cases, involving statutory analogs similar to Illinois's  all of which said it was perfectly appropriate for an insurance company who is required to provide coverage by operation of a public safety statute to seek reimbursement from its own insured. Again, ASI does not address this issue in any way, shape, or form. Mr. Acosta briefly addressed the Bisco versus Liberty case and I'll be quick about that. Bisco had to do with a truck that was not involved in any sort of commercial activity and there was a repair exclusion. In this case, the Ramos Movers truck was being used by a Ramos agent or employee in the transportation of household goods in Illinois in route to an interstate exempt destination under an insurance policy with no geographical limitation after ASI itself had twice certified the policy with the Illinois Commerce Commission and before it canceled the policy. So Bisco is apples and oranges compared to this case. I must briefly discuss the Canal Assurance case because ASI has been talking about that case forever. We attached a complaint from that case. That, in my view, was a tortured effort by a driver of a truck, not a member of the public, to try and get coverage where there was no MCS 90 coverage even though there was MCS 90 endorsement. There was no evidence in that case in any way, shape, or form that that policy in the Canal case had been certified with the Illinois Commerce Commission. I would go so far as to argue that we believe that Judge Mason, at the very beginning of the case, could have and should have granted our motion to dismiss ASI's coverage case. Judge Mason could have taken judicial notice of the certification with the ICC and looked at the allegations of the complaint and seen that Ramos was involved in transporting household goods in the state of Illinois when that truck hit an Illinois citizen. The judge said she wanted to get more facts. She needed more facts. We went out and took depositions of numerous people. ASI went on this witch hunt to try and establish some sort of fraud against its own insured. And then they trotted out this expert, Herbert Murphy, or Herbert Miller, whose expert analysis was infantile. He replaced the battery of the truck. He didn't simulate any conditions, and he had no opinion whatsoever that that car was broken down or that truck was not out of service when the elite truck was rented. We'll go back to Connell for a minute. Written by Judge Hoffman, one of our leading lights, but he does specifically say that the section, it only discusses section 1201 of the Transportation Act, correct? Pardon? Connell only discusses section 1201 of the Transportation Act. He does not address your argument that 4101 actually applies in terms of financial responsibility. He decided to set an instruction. He did not. And because the Connell insurance case was, at least the appellate opinion, was kind of ambiguous on the underlying facts, we went and got a copy of the complaint, and we attached it and made it part of this appellate record to show that the complaint was silent about ICC certification, and this was a case where a truck driver, not a member of the public, in my view, was really struggling mightily to try and create coverage where none exists. I don't think Connell insurance has any weight for the dispute before this court. I'd like to move on to address the issue of the limits of the policy, and I completely agree with you, Justice Quinn, that this issue is not premature. ASI, in fact, is an interloper on this issue. We cannot figure out why ASI is arguing prematurity when National Casualty and Ramos Movers and Torres want an adjudication of the issue of the limits of liability. ASI cites Batiste. There was no issue of coverage in Batiste, and it was a plaintiff who put the cart ahead of the horse by filing a deck action about how much money he would bring if he won the bell. That's not what happened here, and I can understand that courts would look at that sort of circumstance as presumptuous. Jose Torres did not ask to be dragged into this coverage mess, but as a necessary party, he's had to fight this coverage battle, and we cited numerous cases in our brief, and I will mention one of them, Safeco v. Brimey, I think it's pronounced, where the resolution of coverage limits where it's purely legal and fully severable from any issue in the underlying case, it's appropriate and it's right. I would make two more points in that regard. I have found Judge Posner's discussion of probabilistic injury in the Old Republic case to have a lot of power to it. It makes no sense for Jose Torres to go through a trial and wait for a verdict before he knows what his limits of coverage are. It makes no sense. And ASI misread Scottsdale in its opening briefs, and they still insist that Scottsdale, the case, had settled. The case had not settled in Scottsdale, and they sought a declaratory judgment action to find out what the coverage limits were. So the issue was right. And then finally, and somewhat unfortunately, the issue of the limits of coverage for Ramos movers under the national casualty policy is riper now than it was when the briefs were filed, and that's because Elite is no longer in the underlying case. Elite's motion for summary judgment was granted. Mr. Acosta filed an appeal. You affirmed the dismissal of Elite. And so the issue of how much coverage Ramos... Pardon? Which division? This division. So it was a negligent entrustment. We talk about it in our brief. But Elite, as it stands right now, is no longer in the case. The only assurance available right now, as the case presently stands, is the $750,000 from under the ASI policy and the million dollars, we'd argue, under the Elite policy. And this is a situation where we have a man with $835,000 in medical expenses with a truck that cut over four lanes of traffic. It is not an advisory opinion. And I will now move on to the issue of the limits of the policy, unless you have any questions. Thank you. Move on. Well, it's to the limits, so wouldn't it be an advisory opinion now from us if we already held the nationals off the hook? No, no, no. There are two insureds under the national casualty policy. There's the Elite, as the name insured, and then Ramos Movers, who is an insured under the business auto coverage part because they used the van with, used the truck with Elite's permission, and they are also rentee. So it's not moved, and it is right. National casualties policy contains two endorsements, both of which purport to modify the business auto coverage form, both applying to autos rented for less than one year. Both are dated July 1, 2004, and neither endorsement refers to the other. But Class 10 vehicles have two separate liability limits. Now, Mr. Cologia in national casualty will tell you that this is a standard case of a coverage form being limited by an endorsement. But if you look at what happened here, and you look at the symbol endorsement, and I will pull that now, it added symbol 10, and that's any auto used under written rental agreement issued by Elite stating a rental period of less than one year. That's symbol 10. Symbol 10 vehicles constitute about 95% of the entire risk that Ramos, excuse me, that Elite was getting insurance for, and in fact the business auto coverage form only contains nine classes of vehicles, and this 10th class was added. Now, I would argue that the supplemental declarations are akin to an endorsement because they were specifically tailored to this particular insured. It amends the policy, and it lists covered autos section 10 for a million dollars. Now, looking at that supplemental, strike that, looking at the designation symbol endorsement, it was created in 2004 according to, excuse me, it was created in 1997, and it uses the same definition of rental agreement as does the daily rental endorsement. The supplemental declarations must be read in conjunction with the covered auto designation symbol, and here's what's significant about that. The liability limits for symbol 10 vehicles is a million dollars. The premiums charged for class 10 vehicles is $156,000. The supplemental declarations and the liability limits for symbol 10 vehicles do not distinguish between liability limits for Elite on the one hand and Ramos movers to renter on the other, and I would direct the court's attention that National Casualty readily could have done that, and in fact, they did so because in the uninsured motorist portion of the supplemental declarations, they list class 10 vehicles, and they say, what are the limits? See endorsement CA-2107, and they have a split uninsured motorist covered limits along the lines that you were talking about before, Justice Quinn, where they specifically differentiated different levels of insurance for different types of risk. National Casualty did not do that here. The supplemental declarations and the liability limits for symbol 10 vehicles do not even refer to the daily auto rental endorsement, as I just mentioned. The daily auto rental endorsement creates a new class of insureds, rentees. We pointed out in our brief that this creates an ambiguity in and of itself because Ramos movers is someone who is using the vehicle with the lease permission, and they are also renting it. National Casualty did not delete any part of the definition of who is an insured from its business auto coverage form and replace it with the definition of insured as a rentee. I argue that this creates an ambiguity, and this was folly since 90% of the premium was for class 10 vehicles. And then finally, the daily auto rental endorsement has the same definition of rental agreement as a symbol 10 endorsement. Even though $950,000 is in the balance here, National Casualty only spends three pages of its brief addressing the limits issue, and they cite two cases. One is GE Mathis versus Continental Insurance. That case presents the classic issue where coverage is granted in the coverage form and limited by an endorsement. Here we have two conflicting and irreconcilable endorsements. Moreover, the insured in GE Mathis was trying to get coverage even though there was no premium paid for completed operations, and a reference on the declaration page said the coverage for completed operations was excluded. I would argue GE Mathis supports our position in light of what the supplemental declarations say unabashedly and nakedly that cover 10 autos to the limit of liability is $1 million and that $156,000 was paid for that coverage. National Casualty also addresses CIPS versus Allianz at 240-3598. That case did not deal with two conflicting and irreconcilable endorsements. There was an explicit and concise pollution exclusion, which was muddied by the use of three little words, notwithstanding the foregoing. There's probably no appellate opinion that's ever gone in more detail about what the term notwithstanding the foregoing involves, but CIPS did not have a conflict between two endorsements. It was an endorsement that was clear on its face except for the use of the word notwithstanding. So we would ask that the order of Judge Mason be affirmed in its entirety. Jose Torres is a statutory beneficiary of this policy. ASI cannot use coverage defenses against its own insurer to deprive Mr. Torres of his damages. The primacy and significance of the certification of the policy with the ICC makes it primary insurance. ASI has not been able to overcome the presumption that in a rental car context the policy is excess, and National Casualty drafted a very sloppy policy with irreconcilable endorsements, which, as you said, Justice Quinn, must be construed in favor of coverage based on what a reasonable person would think. And if I'm Arthur Jones or I'm Ramos Movers, I'm saying, hmm, I have a million dollars of coverage under the supplemental declarations. It doesn't mention the rental endorsement. The rental endorsement gives me $50,000 of coverage. That's a conflict. National Casualty could have corrected it. They did not. Ambiguities must be resolved against the insurer and in our favor. My final point on that is that while this case was pending, the Illinois Supreme Court came out with State Farm versus Illinois Farmers, which said that step-down provisions are appropriate, but only if they're unambiguous. And the issue of ambiguity, which is what we're dealing with here, was dismissed for lack of appellate jurisdiction. But validity of a step-down provision is one thing. Ambiguity is another. Because this provision and these provisions are ambiguous, coverage should be granted in the amount of $1 million to Ramos Movers. Does it matter if National is also primary? It's just a question I have until National is going to argue again that they're across the field. The general rule is the owner of the vehicle provides primary, and the insurance case that they cite, State Farms versus Hearst and Alamo, I think stands for the proposition that people who rent cars assume the rental company is going to be their insurer. And since they want to be disabused of that, the law requires, the case law requires, the rental companies to get waivers, written waivers, by the person renting the car to say, I understand you're not going to give me primary insurance. Rather, I've got my own insurance. If I have insurance, you are excess. So if National is failing to do that with the Jones, I suggest they might also have to provide primary. Does that impact on your case? Well, it certainly would. And I would agree with National Casualty that there is no distinction in my mind between making a conscious, a rental company making a conscious offer to a renter to choose the rental car's insurance as primary on the one hand, and not making that offer at all. The presumption still hasn't been overcome. And in any event, this is a public safety financial responsibility statute, and the National Casualty Policy and the rental agreement says it's excess. So as a matter of statutory construction and policy interpretation, we agree with Judge Mason that this is an excess policy. Okay. If there are any other questions, I'll step down. Thank you. Thank you, Counselor. I'll be very brief on that rebuttal. First, I'm going to address the points that were raised by Elite. The first point that they raised is that somehow American Service conceded that this was a temporary substitute vehicle. That is absolutely not in the record, and it's absolutely false. American Service filed a motion for summary judgment on count two, and in it very explicitly said, for purposes of our motion for summary judgment only, we will concede that, because that's the only way the court could get to two. But that's the appeal we have in front of us, isn't it? I'm sorry? Isn't that the appeal we have in front of us for purposes of summary judgment? The issue we have in front of us is that resulting summary judgment. Not on count one it's not. Count one is a question of fact. The trial court never made any factual findings on it, and the court didn't have to, because if the court is, in fact, correct, and the jurisdiction provo one does not apply here, if the trial court is correct, then the underlying facts don't make any difference. And as counsel for Torres points out, we wouldn't be able to assert any of those defenses. That's why it didn't matter. Let's take a step back. Has ASA ever retained the outside counsel for Mr. Ramos, for Ramos Trucking? Yes, under Reservation of Rights. They are defending him under Reservation of Rights. And that was tendered, which is a good point there. The defense, Ramos Movers, tendered the defense to national casualty who refused. But isn't there clearly a conflict between you and Ramos? You're coming in saying it's not a covered vehicle at all, specifically it's not a substitute vehicle at all. We shouldn't have to cover Ramos at all, yet we're going to represent Mr. Ramos in this case. I don't, under De Villa v. Williams and, frankly, several other cases, I would think it would be pretty clear by now that insurance companies can't come in and say, on their own, say I represent him and he's wrong, we don't cover him. He had his own, Ramos Movers had his own counsel in the underlying action and in the DJ. So, he was represented by his own independent counsel. He is no longer, that counsel is withdrawn from the case and is no longer involved in the case. But the idea that somehow we have conceded that on appeal and that it's been waived, how can I waive what's never been raised? The trial court made no such finding that this was a temporary substitute vehicle, and we didn't concede it. We only conceded it for purposes of getting the court to look at count two, which is the only way the court could look at count two of our complaint. That is, if, in fact, there was coverage under our policy, they would provide primary coverage. Because if we went on count one, there would be no coverage under our policy. And to suggest that we waived it, it just ignores the facts and ignores the law. This court can't make that determination. The other fact which they state, which again is not in the record, is Ramos Movers denied that Jones is an employee. And that is important for purposes of who rented the vehicle. Again, a question of fact. Ramos denied that Jones did not answer and was defaulted. Now, as far as the insurance contract itself, I want to remind this court that what they're relying upon for purposes of their exclusion for coverage, what ELITE is, is a contract, the rental contract between Ramos Movers or Jones, depending on how you look at that, and ELITE. The insurance contract, on the other hand, is what controls you. You compare the allegations of the complaint to the provisions in the insurance policy to determine insurance coverage. And I'll read to you the national policy. It says, for any covered auto you own, this coverage form provides primary insurance. ASI's policy reads, with respect to a temporary substitute automobile, this insurance shall be excess insurance. Both insurance policies here, when you read them and apply the allegations of the complaint, determine from that standpoint who's primary and secondary. It's not this contract, this third-party contract between their insured and someone else. The point that we made in the court below is that ELITE has to provide primary coverage because, and I think I readily agree with what counsel is saying here, Jones is an insured under nationals policy. They admit it in deposition. There is no distinction in nationals policy between Jones and ELITE. They are both defined as an insured under who is an insured. And the policy is used, insured, insured throughout the policy. So at a bare minimum, there's an ambiguity involved in the policy in the event that they're trying to say he's some type of special insured because he rented the vehicle, because he is very clearly defined as an insured under the policy, and they admitted it in their deposition. Addressing the arguments by counsel regarding this giant loophole, I think he kind of misses the point because that's not, we're not claiming that there's a loophole which covers American Service Insurance Company or Ramos Movers. That's why the BISCO case comes into play. It's not a loophole that applies generally, and it's not even a loophole at all. It's the application of the law to the particular facts, and that's where BISCO comes in. And I'll read you the exact quote, which is dead on point here. And it says, thus, while the UPS van may usually be driven within the scope of the transportation law, which is what they're arguing, citations are omitted, such as to activate the statutory compulsory insurance provisions, which is what they're arguing, the use of the van in this instance was outside the purview of the statute. That is exactly what we have here. The purview of this statute, 1201, takes it outside the limit. It's not 4101. 4103. 4101, Judge. Justice, if you read 4101 in the manner in which they're reading it, it would render Section 1201 superfluous. And as standard statutory construction, you cannot do that. What they're suggesting here is that 4101, because it says operating within the state of Illinois, covers anybody that's operating within the state of Illinois. 1201 is more specific. And it says if you're engaged in intrastate commerce, it's covered. Otherwise, it is not. He's trying to suggest, well, it's intrastate commerce, so therefore it's covered because of 4101. That would mean that anybody that drives through Illinois who's engaged in interstate commerce would be covered under 4101. And we know that's not the case. They have argued that this is not so. Okay. The certified policy that he's making the argument about deals, again, Section 1201 eliminates the idea that there's any provisions of the certified policy. This is what this whole case boils down to. If Section 1201 applies here, all of their arguments are gone. And if Section 1201 doesn't apply here, then I lose. And then we're dealing with whether or not we're primary or secondary. But it's the interpretation of 1201 which governs this. And finally, dealing with the insurance, and the point that Justice Quinn, you made, dealing with the idea of when you walk into a rental agency and you want to rent a vehicle, they normally give you the option of renting a vehicle. And that's what the case law says, very specifically says. And they say it doesn't matter. And I suggest to you it absolutely does. Because when they make that suggestion to you, you make a knowing decision. You may not even have insurance. There's no evidence here that anybody at Elite checks to whether or not Jones has insurance or ever does at any time. And also, the Jones, when he walks in there, when he has an opportunity to waive the insurance, he also says he can also purchase the insurance and generally purchase, decide whether or not he wants to have this type of coverage, this type of coverage, how much coverage. We've all rented vehicles and we know that you have a whole bunch of opportunities to have coverage here. But the bottom line here, what they can't get around, and nobody seems to be able to get around here, is that the statute in Illinois requiring insurance for this trucking company, Elite, demands and requires that Elite provide insurance for the truck and for the driver. Nobody has addressed that statute. That's the statute that controls here. Thank you. Thank you, Pastor. I will confine my reply to just pointing out in response to Torres' counsel's argument about the ambiguity of the policy that the business auto coverage form supplemental endorsements specifically refers to a schedule of forms and endorsements. It says, forms and endorsements applying to this coverage form and made a part of this policy at the time of issue. The schedule is attached. It's in the record. It specifically references the daily auto rental endorsement. The daily auto rental endorsement says, the limit of insurance for liability coverage provided by this policy for the rentee is $50,000 for bodily injury to any one person caused by any one accident. It's not ambiguous to the extent it conflicts with the declarations it controls and it was specifically referenced to the insurer, be it Ramos or Elite, in the declarations form as part of the policy. Thank you. Thank you, Pastor.